UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES HILDEBRANT, STEVEN LAUTNER,
OSCAR LOPEZ, AND DOUGLAS WORTLEY,

                Plaintiffs,                        Case No. 13-cv-13972

v                                                Honorable Thomas L. Ludington

MEREDITH CORPORATION,

                Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

Plaintiffs are police officers with the Saginaw County Police Department. In the summer of 2012, Plaintiffs were the subject of an internal investigation regarding their conduct during an inventory of a forfeited house. A confidential source provided information about the investigation to a reporter for Channel 5 news—operated by Defendant Meredith Corporation— which then aired a series of broadcasts regarding the internal investigation.

Plaintiffs then commenced an action against Meredith Corporation for defamation. Plaintiffs claim that the September 2012 broadcasts contained defamatory statements, such as that Plaintiffs were "accused of stealing during a raid" and were "accused of stealing drugs during a raid."

On September 3, 2014, Defendant filed a motion for summary judgment, alleging that Plaintiffs cannot show that the broadcasts were false or that they were made with actual malice. Because the statement that Plaintiffs were "accused of stealing during a raid" is substantially true, Defendant's motion for summary judgment will be granted in part. However, summary

judgment will be denied with respect to the statement that Plaintiffs were "accused of stealing *drugs* during a raid." Plaintiffs have produced sufficient clear and convincing evidence for a reasonable jury to conclude that the statement was false and was made with actual malice, and therefore summary judgment will be denied in part.

## I

Plaintiffs are all members of the City of Saginaw Police Department.  On June 20, 2012, their supervisor, Seargant Kevin Revard, ordered them to 2804 Adams Boulevard to assist in inventorying the items in a house following a seizure.  As explained by Sergeant Revard:

> Forfeiture process is when we do search warrants, we'll seize property. And there's a form filled out for each item that's taken. And then that's turned over to the county prosecutor. . . . And then he would go through the court procedure of turning those items eventually over to us. And then our department would then sell most of that stuff, like on eBay, for instance.

Resp. Ex. 8 at 7-8, ECF No. 22.  The house had been seized by the City of Saginaw as the result of a drug raid.

When Plaintiffs arrived at Adams Boulevard house, Sergeant Revard instructed them to go through the house to search for any leftover contraband and to begin sorting the valuable items from the non-valuable items.  Sergeant Revard had called Plaintiffs in because they had executed many search warrants and they "all knew what was worth taking, what wasn't".  *Id*. at 9.

However, this time, Plaintiffs may have misunderstood Sergeant Revard's instructions.  Sergeant Revard testified that he told Plaintiffs that he wanted to check the house for contraband,

> [a]nd while we were doing that, we could also gather up the stuff that was of value, okay, so it wouldn't be so hard for [the property room clerk] to go through the whole house, okay?  And then I told them that the rest of the stuff was going to get thrown out on the curb for trash.

*Id.* at 10.  Sergeant Revard's instructions were apparently misunderstood by Plaintiffs, however:

> When I told them that stuff was going to go out on the curb, I didn't tell them that [the property room clerk] was going to come like the next day or something. . . . So the misunderstanding part was when I told them the stuff that wasn't of value was going to get thrown out on the curb, I believe they took that as it was going to get thrown out on the curb that day.

*Id.* 11.

Indeed, Plaintiffs understood Sergeant Revard's instructions as permission to take those items that would otherwise be placed on the curb:

| Q: | Who did you have permission from? |
|---|---|
| Officer Lautner: | Sergeant Revard. |
| Q: | When did Sergeant Revard give you that permission? |
| Officer Lautner: | I believe it was when we arrived. . . . |
| Q: | And what did Sergeant Revard tell you with regard to taking items? |
| Officer Lautner: | That's a general question. What do you mean? |
| Q: | Did you ask him specifically, "Can I take this rake?" |
| Officer Lautner: | No. |
| Q: | Okay. Did you ask him generally can I take items? |
| Officer Lautner: | Not directly. |
| Q: | Okay. Well, what did he tell you? |
| Officer Lautner: | He said that to gather items of value and everything from the house was going to be thrown away that wasn't valuable. And anything that wasn't valuable we could basically take. |

Mot. Summ. J. Ex. 5 at 22, ECF No. 16; *see also* Mot. Summ. J. Ex. 2 at 11 (Q: "Did Sergeant Revard expressly tell you that you could take any items from the home?" A: "It was implied that

everything was—anything that was going to be thrown away it was going to be trash and the City would have no use for it."); Mot. Summ. J. Ex. B 19-20 (Q: "Who gave you permission?" A: "Sergeant Revard").

Because they believed that Sergeant Revard had given them permission, Plaintiffs removed a variety of items they believed to be without value. Officer Lautner put a rake, a shovel, a firepit, a lawnmower, a heater, and jumper cables in his vehicle. Mot. Summ. J. Ex. 5 at 19; Ex. 12 at 4. Officer Wortley placed a propane tank, a paper towel holder, and an electric scooter and put them in his vehicle. *Id*. Ex. 2 at 11-12. Officer Hildebrant removed a small desk with a glass top, a computer slide, a metal trash can, and a screwdriver in Officer Wortley's vehicle. *Id*. Ex. 4 at 14-15. Officer Lopez took a patio table and umbrella, two garden rakes, and a shovel and took them to his mother's home. *Id*. Ex. 3 at 16, 19.

On June 28, 2012, Police Chief Gerald Cliff learned that there may have been a larceny involving Plaintiffs at the Adams Boulevard house. *Id*. Ex. 9 at ¶ 8. Chief Cliff requested that both the City of Saginaw Police Department Internal Affairs Department and the Michigan State Police conduct an investigation into the alleged larceny. *Id*. at ¶ 9-10.

Following the internal investigation, *see id.* Ex. 11, and the Michigan state police investigation, *see id.* Ex. 12, the Saginaw Prosecutors Office declined to authorize any criminal charges. *Id*. Ex. 12 at 17-18. Instead, the Saginaw Police Department would "handle any discipline internally." *Id*. at 18.

On August 30, 2012, each Plaintiff received a Discipline Notice. Each Discipline Notice stated that the officer "took items that were forfeited to the City of Saginaw. You were not authorized to take the items to your personal residence and you did so while you were on City

- 4 -

time. . . . Your poor judgment and inappropriate conduct will results [sic] in a five (5) day unpaid suspension from your job." Ex. 13.

The Disciplinary Notices were disclosed to the press, and Channel 5 informed the public on September 5, 2012.  During the six-o'clock news, Jonathan Lowe reported that:

> According to a memo obtained by TV-5 written by Saginaw Personnel Director Dennis Jordan, Back on June 20th four members of the Saginaw Police Department's Gang Task Force executed a search warrant at this home at 2804 Adams Boulevard.  **The memo says the officers stole items during that raid and then took those items home all while on the clock**. . . . The memo identifies the officers as Steve Lautner, Oscar Lopez, James Hildebrant, and Douglas Wortley.[1]

Resp. Ex. 1 (emphasis added).

Later that evening, the 10 o'clock broadcast reported the story again:

> A memo written by city personnel director Dennis Jordan says the officers, Douglas Wortley, Steve Lautner, Oscar Lopez, and James Hildebrant, **stole stuff from this home on Adams Boulevard after a raid** in late June 20.

*Id.*

The next day, September 6, 2012, the City of Saginaw issued a press release regarding Plaintiffs' discipline. The press release stated that the Plaintiffs had been under investigation for allegedly mishandling property, but that there were no findings of criminal activity:

> Members of the Saginaw Police Department's Gang Task Force have been under investigation by the Michigan State Police, and the Internal Affairs Division of the Department for allegedly mishandling property seized in a forfeiture clean-out due to a drug raid at 2804 Adams Boulevard in Saginaw on June 20, 2012. . . . While there were no findings of criminal activity by the State Police, the matter was referred to the Internal Affairs Division of Saginaw Police Department and to the City's Employee Services Department.
>
> Our internal investigation has determined that the handling and processing of evidence was in violation of departmental policies and procedures.  Those members involved have been disciplined accordingly.

Mot. Summ. J. Ex. 15 at 2-3.

---

[1] The statements that Plaintiffs claim are defamatory are emphasized.

- 5 -

Channel 5 news continued reporting the story in the following days:

- Plaintiffs were "**accused of stealing from a home** after a drug raid . . . ." during the September 6, 2012 five o'clock broadcast.

- "Four Saginaw police officers are facing suspension. **Accused of taking items during a drug raid** and doing so while on city time." September 6, 2012 six o'clock broadcast.

- Plaintiffs were "**accused of stealing items during a raid**" during the September 7, 2012 five o'clock wakeup broadcast

Resp. Ex. 1 (emphasis added).

On the evening of September 8, 2014, Channel 5 once again reported the story, but with an additional piece of information:

The police officers association of Michigan blasting Saginaw city hall for what the organization says is an effort to undermine police. In their statement they accuse city manager Darnell Earley of discrediting the officers by relying on unproven facts, innuendo, and speculation. The statement comes after the city disciplined four officers **accused of stealing drugs** during a raid.

*Id.* 9/8/12 six o'clock broadcast (emphasis added).

The script for the September 8, 2014 broadcast that claimed Plaintiffs had been accused of stealing drugs was written by news producer Mike Herek. Mr. Herek had also prepared the script for the eleven o'clock broadcast, and had included the language about stealing drugs in the later script, too. However, Jonathan Lowe, who had previously reported the story, recognized that the "stealing drugs" statement was incorrect and omitted it from his report:

Q:    With regards to the broadcast for September 8, 2012, do you recall making any changes to the script that was prepared for you?

Lowe:  Scripts as far as what?

Q:    With regards to this segment dealing with my clients.

Lowe:  Yes, I did.

> Q:      What changes did you make to the script with regard to the story about my clients?
>
> Lowe: There was a reference to the officers being accused of taking drugs.  I knew that was incorrect and changed it to what we had initially been reporting, that the City was accusing them of taking—or stealing property from a—during a raid, or whatever it says in the script that you have.
>
> Q:      I see.  So you took the reference out for taking drugs and you put in—you rewrote it to reflect what you understood the facts to be?
>
> Lowe: Correct.

*Id*. Ex. 12 at 27-28.

About one week later, on September 14, 2012, Channel 5 issued "clarifications" during the six o'clock and eleven o'clock broadcasts regarding the story.  The clarifications noted that (1) the alleged misconduct did not occur during a raid, and (2) the Plaintiffs had not been accused of stealing drugs:

> We need to make a clarification to a story we brought to you Saturday [September 7, 2012].  It was a follow up to the situation at the Saginaw P.D. where four officers were suspended after being accused of taking items from a home.  Now, that home had been confiscated by authorities under Michigan's drug forfeiture laws.  In our story we mistakenly reported that the officers were accused of stealing drugs during a raid.  We want to be clear the officers were not accused of stealing drugs.  There also was no raid at the time the items were allegedly taken.  We apologize for any confusion or embarrassment that this story may have caused.

*Id*. Ex. 1.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the

opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III

Plaintiffs allege that Channel 5's broadcasts contained defamatory language. These alleged defamations can be divided into two categories: (1) the statements that Plaintiffs were "accused of stealing items during a raid" and (2) the statement that Plaintiffs were "accused of stealing drugs during a raid."

In Michigan, the four basic elements of a defamation claim are:

(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication."

*Smith v. Anonymous Joint Enterprise*, 793 N.W.2d 533, 540 (Mich. 2010) (quoting *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005)).

Channel 5 contends that Plaintiffs cannot satisfy the first and third elements: that the statements were false and were made with the requisite level of fault.[2] Specifically, it contends that (1) the statements were substantially true; and (2) Plaintiffs are public officials and cannot show that Channel 5 acted with actual malice.

### A

Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide. *Ireland v. Edwards*, 584 N.W.2d 632, 638 (Mich. Ct. App. 1998).

---

[2] Defendants do not make any arguments concerning the second and fourth elements.

To be considered defamatory, statements must assert facts that are "provable as false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990). "The dispositive question . . . is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning." *Smith*, 793 N.W.2d. at 548.

To avoid liability, it is not necessary for "defendants to prove that a publication is literally and absolutely accurate in every minute detail." *Rouch v. Enquirer & News of Battle Creek Michigan*, 487 N.W.2d 205, 214 (Mich. 1992). Rather, substantial truth is an absolute defense to a defamation claim. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) ("The common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth."); *Rouch*, 487 N.W.2d at 258-59 ("[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."). If "the gist, the sting, of the article is substantially true," the defendant is not liable. *Id*. at 767-68. In slander cases, it is the plaintiff's burden to prove falsity. *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992) (citing *Rouch*, 487 N.W.2d at 211).

Here, there are two categories of statements at issue. In the first, Channel 5 reporters stated that Plaintiffs were "accused of stealing during a raid." As explained in detail below, these statements were substantially true, and therefore they are not defamatory. However, with respect to the statement that Plaintiffs were "accused of stealing *drugs* during a raid", the statement is false and Plaintiffs have satisfied that element of their prima facie case.

**i**

Michigan courts have noted that "[t]he substantial truth doctrine is frequently invoked to solve two recurring problems: [1] minor inaccuracies and [2] technically incorrect or flawed use

of legal terminology"—both of which are issues in the current matter.  *Rouch*, 487 N.W.2d at 215.

First, to the extent that Plaintiffs contend that they were inaccurately accused of stealing "during a raid", this is a minor inaccuracy that does not paint a "very different picture" from the actual accusation.  *See Masson*, 501 U.S. at 523-24.  While the use of the phrase "during a raid" may cause the public to view Plaintiffs' actions in a more negative light,[3] this does not skew the contents of the broadcast so as to make it less than substantially true.  The broadcast as whole is a straightforward restatement of the factual circumstances: Plaintiffs were investigated on accusations that they stole items while working.  The gist of the story is that Plaintiffs were accused of stealing while performing their job duties, whether during a raid or afterwards.  Thus, because the gist of the story remains, the statement that Plaintiffs were accused of stealing *during* a raid—though containing a minor factual inaccuracy—is substantially true.

Second, Plaintiffs contend that they were inaccurately accused of stealing because they did not actually steal anything.  Plaintiffs note that the Saginaw Prosecutors Office declined to pursue criminal charges against them, and repeatedly reiterate that the objects taken from the house had no value.

But Plaintiffs conflate the accusations with the underlying actions.  Even if Plaintiffs did not "steal" the items by "permanently depriving the true owner of their value", they were in fact investigated for larceny.  *See* Mot. Summ. J. Ex. 12 (investigation report titled "Larceny of Real Property); *id.* Ex. 9 at ¶ 9 ("I contacted the City of Saginaw Police Department Internal Affairs Department and requested that it conduct an *investigation about the possible larceny of personal*

---

[3] For example, by implying that the police officers were derelict in their duties by stealing rather than focusing on the raid.

*property* . . . .).  Thus, the statement that they were *accused* of stealing is substantially accurate, if not entirely accurate.

In addition, "[t]echnical inaccuracies in legal terminology employed by nonlawyers" are not actionable.  *Rouch*, 487 N.W.2d at 216.  Although Plaintiffs understand "steal" to be its legal definition—"intent to permanently deprive"—the popular sense of the term is "to take dishonestly or secretly".  Oxford Dictionary.  But even if Plaintiffs did not "steal" in its technical, legal sense, this statement cannot be the basis for liability.  As the Michigan courts have explained:

> To do so would totally eviscerate the "breathing space" that the constitution requires in order to protect important First Amendment rights.  When writing about criminal justice or legal matters, newspapers would be forced to recapitulate technical legal terminology employed by courts or law enforcement personnel even where popular words might be clearer for the lay reader.

*Rouch*, 487 N.W.2d at 218-219.

In *Rouch*, the plaintiff brought a defamation suit against a newspaper that had claimed that plaintiff was "arrested and charged with" a crime. However, the plaintiff had not actually been formally charged with the crime. The *Rouch* court nevertheless concluded that the statement was substantially true, especially because the word "charged" may "be used in a popular sense as a synonym for accuse." *Id*. at 218.  And the newspaper was not under an obligation to inform its readers that it was using the word "charged" in the popular, rather than legal, sense:

> Attempting to reframe legal documents and events with legal significance into popular or lay terminology would be fraught with peril, and newspapers would do so at their risk. As one court remarked, there is "no authority for plaintiff's contention that a newspaper article reporting a judicial proceeding must indicate every possible interpretation of every word used in a complaint or other legal document."

*Rouch*, 487 N.W.2d at 219 (quoting *Handelsman v. San Francisco Chronicle*, 90 Cal. Rptr. 188, 191 (1970) (ruling that use of the criminal term "theft" was not substantially untrue despite the fact that the complaint involved a civil action for conversion).

Here, Channel 5 repeatedly reported that Plaintiffs were accused of "stealing." Although never formally charged with theft pursuant to the statute, they were indeed investigated for a possible larceny. *See* Mot. Summ. J. Ex. 12. And even though Plaintiffs claim that it was not possible to steal value-less items under a legal definition,[4] the statement remains substantially true when using the popular sense of the term "steal."

Thirdly, Plaintiffs seem to contend that because the memo and press release did not expressly state that the Plaintiffs were accused of stealing, the broadcasts stating that they were "accused of stealing" are false. In other words, because Channel 5 could not have known at the time of the original broadcasts that Plaintiffs were accused of stealing, the broadcasts themselves were false.

Plaintiffs point out that the disciplinary notices the Channel 5 reporters relied on stated only that Plaintiffs "took items that were forfeited to the City of Saginaw. You were not authorized to take the items to your personal residence and you did so while you were on City time." Mot. Summ. J. Ex. 13. Plaintiffs contend that nowhere in the disciplinary notices does the author use the term "stealing". Thus, according to Plaintiffs, at the time Channel 5 first aired the story, it could not have possibly known that Plaintiffs were investigated for a possible larceny.

This perplexing argument is not persuasive. Although not mentioned in the press release or memo, Plaintiffs were indeed investigated for stealing items. *See* Mot. Summ. J. Ex. 12, 9.

---

[4] In fact, at least one Michigan court has determined that the value of the items taken is not an element of offense of larceny in a building. *See People v. Midgyett*, 212 N.W.2d 754, 755 (Mich. Ct. App. 1973) (citing Mich. Comp. Laws § 750.360).

That Channel 5 did not rely on these reports—which it did not have access to—does not make the statements false.  Indeed, a defendant "need not prove they actually relied on, or even consulted, these reports. It suffices that their statements are consistent with such sources." *Dupuis v. City of Hamtramck*, 502 F. Supp. 2d 654, 657 (E.D. Mich. 2007).  The statements that Plaintiffs were accused of stealing were factually accurate at the time the broadcasts were made, even if Channel 5 did not have access to the documents explicitly indicating that Plaintiffs were being investigated for larceny.

Therefore, the statements that Plaintiffs were accused of stealing items are not actionable because they were substantially true.  Accordingly, summary judgment will be granted with respect to the statements that Plaintiffs "were accused of stealing during a raid."

**ii**

In contrast, the statement that Plaintiffs "were accused of stealing *drugs* during a raid" is not substantially true. No piece of evidence indicates that Plaintiffs were ever investigated for stealing drugs. Indeed, Mr. Herek, the producer, admitted that the accusation was false and that he did not know where it came from:

> Q:     [O]bviously you're acknowledging it as an inaccurate statement that appears in your transcript, correct, the one that Sam Merrill was saying about stealing drugs, right?

> Herek: It is inaccurate.

> Q:     Do you know where that inaccuracy came from, how you came up with that information that you included in the script?

> Herek: Yes, I screwed up.

Resp. Ex. 20 at 8-9.  Thus, Plaintiffs have made a prima facie showing that the statement that they were accused of stealing drugs is false.

- 13 -

**B**

Next, Channel 5 contends that Plaintiffs cannot show that the only remaining defamatory statement—that Plaintiffs were accused of stealing drugs—was made with actual malice. Channel 5 contends that the heightened actual malice standard applies because Plaintiffs are public officials. Plaintiffs disagree, however, instead contending that they are private parties and need only show that the defamatory statement was negligently made.

**i**

In defamation lawsuits, the issue of whether a plaintiff is a public official or public figure affects the application of the standard for summary judgment. First, the district court must make the legal determination whether the plaintiff is a public official or public figure. If the court determines that the plaintiff is not a public official or public figure, the plaintiff must demonstrate only negligent conduct on the part of the defendant. If, however, the court determines that the plaintiff is a public official or public figure, then the plaintiff bears the burden of demonstrating, by clear and convincing evidence, that the defendant acted with actual malice. In the context of summary judgment, the Supreme Court has explained that "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

Clearly, then, the decision of whether Plaintiffs in this case are public officials will have a significant impact on the subsequent defamation analysis. All parties rely on Michigan state law to support their arguments. Channel 5, for example, cites *Tomkiewicz*, 635 N.W.2d 36, in which the Michigan Court of Appeals determined that a police lieutenant was a public official, and thus the plaintiff-police lieutenant had to meet the higher threshold of showing actual malice.

Plaintiffs, in contrast, attempt to distinguish *Tomkiewicz* by pointing out that they are "rank and file" members of the police force with almost no supervisory or policy-making power.

Although Plaintiffs and Channel 5 rely solely on Michigan case law in making their respective arguments, it is clear that state law is not alone controlling here. Indeed, the Supreme Court in *Rosenblatt* rejected the idea that state law standards could define the category of public officials. *Rosenblatt v. Baer*, 383 U.S. 75, 84 (1966) ("States have developed definitions of 'public official' for local administrative purposes, not the purposes of a national constitutional protection."). State law does not control because the protection of "public officials" is rooted in the First Amendment's "strong interest in debate on public issues, and . . . strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." *Id*. at 85. Moreover, if state law determined whether a plaintiff was a public official, "the constitutional limits of free expression in the Nation would vary with state lines." *Rosenblatt*, 383 U.S. at 84 (quoting *Pennekamp v. State of Florida*, 328 U.S. 331, 335 (1946)).

And the issue of which *interpretation* of federal law controls—state or federal—will normally not cause any issues.[5] However, with regards to defamation claims, it appears that the Michigan courts and the Sixth Circuit may have reached different conclusions regarding whether rank-and-file police officers are public officials.[6] For example, the Michigan courts—applying federal constitutional law—have determined that police officers are public officials. *See Tomkiewicz*, 635 N.W.2d at 42*; Brown v. City of Detroit*, 2004 WL 2624734, at *2 (Mich. Ct. App. Nov. 18, 2004) ("Because plaintiff is a police officer and the allegedly defamatory

---

[5] The Sixth Circuit and other courts have often applied state-law definitions of "public official" in determining the criteria to be met. *See, e.g., Woodruff v. Ohman*, 29 F. App'x 337, 347 (6th Cir. 2002) ("We think it is clear that Woodruff, as a post-doctoral research assistant, does not meet the criteria set forth by the Tennessee Supreme Court to qualify as a public official.").

[6] This issue requires attention to the interplay between federal constitutional rights as a floor to a state law tort claim. Certainly, in diversity actions alleging state law tort claims, state law generally governs. But here, where the Supreme Court has set a federal constitutional minimum, and directs federal court to apply a federal constitutional standard when examining a state law tort claim, the possibility of antagonism may arise.

statements concerned his conduct as a police officer, plaintiff is a public figure.").[7]  Thus, the
Michigan Courts have determined that even rank-and-file police officers may be public officials.

In contrast, the Sixth Circuit has suggested that mere rank-and-file officers may not be
public officials for First Amendment purposes.  In *Young v. Gannett Satellite Information
Network, Inc.*, the Sixth Circuit examined a police officer's defamation claim against a local
newspaper.  734 F.3d 544 (6th Cir. 2013).  The district court had determined that, pursuant to
Ohio's interpretation of federal law, a police officer is a "public official" who must show actual
malice to prevail on a defamation claim.  *See Soke v. Plain Dealer*, 632 N.E. 2d 1282, 1283
(Ohio 1994) ("The United States Supreme Court has repeatedly recognized that police officers
are public officials.").  On appeal, the police officer conceded that actual malice was the
appropriate standard of review because he was a public official.  *Young*, 734 F.3d at 549.  In
dicta, the Sixth Circuit nevertheless concluded that "had Young not conceded the issue it would
not even be clear that actual malice is the proper standard to apply in this case."  *Id*. at 549.
After surveying Supreme Court precedent, the Sixth Circuit noted that the Ohio court's
interpretation of Supreme Court precedent regarding public officials may be incorrect:

> All of these police officers had key public leadership positions.  Young did not.
> Of course, because Young does not argue that different standard should apply in
> this case, we apply the actual malice standard, without deciding whether it is
> necessarily the proper standard to apply to a rank-and-file police officer.

---

[7] Although the Michigan Court of Appeals held that police officers are "public figures" for purposes of a defamation
claim, this may be a misstatement.  In *Brown*, the Michigan Court of Appeals appears to have conflated the
standards for public officials with that of public figures.  Although citing *Tomkiewicz*, which held that a police
lieutenant may be a *public official*, the *Brown* court concluded that police officers are *public figures*. The two,
however, are not synonymous.  *Compare Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (a limited purpose
public figure is someone "who thrust [his or her self] to the forefront of particular public controversies in order to
influence the resolution of the issues involved.") *and Rosenblatt v. Baer*, 383 U.S. at 85 (public officials "have or
appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" and
they "have such apparent importance that the public has an independent interest in the qualifications and
performance of the person who holds it, beyond the general public interest in the qualifications and performance of
all government employees . . . .").  Given the fact that the *Brown* court was relying on *Tomkiewicz*'s holding, it
appears that *Brown*'s holding that police officers are public figures—rather than public officials—was a scrivener's
error.

*Id.* at 549-50. Thus, the Sixth Circuit has left open the door to challenges that rank-and-file police officers may qualify as public officials.

But it is important to understand that the Sixth Circuit did not close the door to such designations, either.   Instead, it explained—without making a ruling—that Ohio had misinterpreted Supreme Court precedent.   But even though the Supreme Court has never designated a rank-and-file police officer as a public official, every single federal circuit court (other than the Sixth)  to address the issue has: *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 88 (1st Cir. 2007) (school resource officer was a public official); *Coughlin v. Westinghouse Broad & Cable Inc.*, 780 F.2d 340, 342 (3d Cir. 1986) (police officer is a public official); *McKinley v. Baden*, 777 F.2d 1017, 1021 (5th Cir. 1985) (same); *Meiners v. Moriarity*, 563 F.2d 343, 352 (7th Cir. 1977) (DEA agents are public officials); *Speer v. Ottaway Newspapers*, 828 F.2d 475, 476 (8th Cir. 1987) (applying actual malice standard to police officer's defamation claim); *Rattray v. City of Nat'l City*, 36 F.3d 1480, 1486 (9th Cir. 1994) (same); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (police officer is a public official); *see also Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288 n.5 (Mass. 2000) (collecting state law decisions determining that a police official are public officials).   *See also Young*, 734 F.3d at 553 (dissent) (collecting cases).  Therefore, it must be determined whether Plaintiffs, as rank-and-file police officers, were public officials under federal law.

**ii**

To determine whether a plaintiff is a public official, the Supreme Court has stated that

[w]here a position in government has such apparent importance that the public has an independent interest in qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the *New York Times* malice standards apply.

*Rosenblatt*, 383 U.S. at 86. Furthermore, "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id*. at 86, n. 13.

Here, Plaintiffs contend that they are not public officials because they do not exercise any managerial or policy-making authority. Instead, as rank-and-file members of the police force, they are only enforcers of the policy set by policymaking and supervisorial figures.

Although Plaintiffs do not set department policy, they are nonetheless properly characterized as public officials. Courts have recognized that patrolmen occupy a unique governmental position. As members of law enforcement, they have direct and visible interaction with the public. They have the ability to apply the force of government in enforcing the law and the authority to compel members of the public to comply with the law. These characteristics warrant the conclusion that even rank-and-file members of a police force can be considered public officials.

On this point, the reasoning of the 10th Circuit's oft-cited *Gray v. Udevitz* is particularly persuasive. In *Gray*, the plaintiff had been a "street level police officer" and was suing for defamatory statements made against him. 656 F.2d at 589. In finding that the plaintiff was a public official, the court noted that street-level police officers, in addition to those of higher rank, "'have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs,'" and such officers "ha[v] such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualification and performance of all government employees. . . ." *Id*. at 591 (quoting *Rosenblatt*, 383 U.S. at 85). The Tenth Circuit further noted that street-level officers are visible to the public, have authorization to use force, and are in such a position

- 18 -

that, if they abuse their authority, they may deprive citizens of their constitutional rights.  *Id.* at

591.

Indeed, the Michigan Court of Appeals relied on *Gray*'s reasoning in its *Tomkiewicz*

opinion.  Although the plaintiff in *Tomkiewicz* was a police lieutenant, the Michigan Court of

Appeals cited with approval the reasoning of the New Jersey Supreme Court, which in turn

quoted *Gray*:

> A police officer on a beat is the member of the department who is most visible to
> the public.  He possesses both the authority and the ability to exercise force.
> Misuse of his authority can result in significant deprivation of constitutional rights
> and personal freedoms, not to mention bodily injury and financial loss.  The
> strong public interest in ensuring open discussion and criticism of his
> qualifications and job performance warrant the conclusion that he is a public
> official.

*Tomkiewicz*, 635 N.W.2d at 43 (citing *Costello v. Ocean Co. Observer*, 136 N.J. 594 (1994)

(quoting *Gray*, 656 F.2d at 589)).

Thus, because of their heightened visibility and their authority to use force, Plaintiffs are

properly characterized as public officials.[8]  And, because the Michigan courts addressed whether

police officers can be public officials using the proper analysis under federal law, this situation is

distinguishable from that in *Young*, where the Sixth Circuit noted that Ohio's interpretation was

premised on an incorrect reading of the law.  As public officials, Plaintiffs must prove that

Defendant aired the broadcasts with "actual malice".

## C

To demonstrate actual malice, a plaintiff must prove that the defendant made the

statement with "knowledge that the published statement was false or with reckless disregard as to

---

[8] Plaintiffs, relying upon *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522 (6th Cir. 2014), argue that they are not "limited-purpose public figures" because they did not thrust themselves into a public controversy.  But because Plaintiffs are public officials under under the *New York Times v. Sullivan* standard, 376 U.S. 254 (1964), the Court need not reach the question of whether they are limited-purpose public figures.

whether the statement was false or not." *Tomkiewicz*, 635 N.W.2d at 46 (quoting *Ireland*, 584 N.W.2d at 640.  Moreover, reckless disregard does not mean that the speaker merely failed to act with reasonably prudent conduct, but instead requires "sufficient evidence to justify a conclusion that the defendant made the allegedly defamatory publication with a 'high degree of awareness' of the publication's probable falsity, or that the defendant 'entertained serious doubts as to the truth' of the publication made." *Smith*, 793 N.W.2d at 541-42.  Whether the evidence presented is sufficient to show actual malice on the part of the defendant presents a question of law to be decided by the courts.  *Id.* at 539.

Here, there is only one remaining alleged defamatory remark: that Plaintiffs were accused of stealing drugs.  During a broadcast on September 8, 2012, anchorman Sam Merrill reported that

> The police officers association of Michigan blasting Saginaw city hall for what the organization says is an effort to undermine police.  In their statement they accuse city manager Darnell Earley of discrediting the officers by relying on unproven facts, innuendo and speculation. The statement comes after the city disciplined four officers accused of *stealing drugs during a raid.*

Resp. Ex. 1 9/8/12 six o'clock Broadcast (emphasis added).

The broadcast transcript was prepared by Herek, the producer.  In his testimony, Herek explained that he prepared the statement by reviewing the earlier stories and archived material:

> Q:     In other words, where is your source of information that you get as a producer?  I mean, how do you find out what you're going to be talking about?
>
> Herek: We get press releases, we get E-mails, we get phone calls.  Sometimes we'll go to the newspaper, find the information, contact that source to confirm it, and then we go with it.  It's a multitude of sources.
>
> Q:     All right.  And what was the source of your information for that statement about what Sam said there?

- 20 -

> Herek: I'm not quite sure how to answer that, because the statement itself is inaccurate. The story was based on a press release we received from the Police Officers Union, whatever it's called. And the rest of the story, I went into our archives to find the history of this story so I could say, This is what the Union is saying, and this is what happened earlier.

Resp. Ex. 20 at 5.

Based on the evidence in the record, a reasonable jury could find actual malice with respect to the statement that Plaintiffs "are accused of stealing drugs." Herek testified that in researching the broadcast, he reviewed the press release and other documents in the archives.

But nothing in the press release or in the memo made any reference to stealing drugs. Nor do prior broadcasts make any reference to stealing drugs. Indeed, not a single one of those documents reviewed by Herek support the statement that they are accused of stealing drugs.

Importantly, Herek admits that he does not know where the information that Plaintiffs "stole drugs" came from:

> Q:      Do you know where that inaccuracy came from, how you came up with that information that you included in the script?

> Herek: Yes, I screwed up.

Resp. Ex. 20 at 5.

Because there was nothing in the press releases or prior broadcasts that would have implied that the officers were accused of stealing drugs, a reasonable jury could infer that Herek fabricated that part of the story. Fabricating a story is evidence of actual malice. *See Cohn v. DeWeese*, 2010 WL 3906227 (E.D. Mich. Sept. 30, 2010); *Mino v. Clio School District*, 661 N.W.2d 586, 595 (Mich. Ct. App. 2003) (Evidence that the defamatory statement was "made up" may demonstrate actual malice); *Church of Scientology Int'l v. Behar*, 283 F.3d 168, 174 (2d Cir. 2001) (citing *St. Amant*, 390 U.S. at 73)(a fabricated story is relevant in showing actual malice).

- 21 -

Defendant nevertheless contends that Herek never actually "entertained serious doubts" as to the falsity of the statements, thereby precluding a finding of actual malice.  Of course, this argument begs the question: how did Herek come up with this assertion and why did he not entertain serious doubts about the falsity of the statement?  There was no indication that any source explicitly or implicitly informed Herek that Plaintiffs had been accused of stealing drugs.  That there is evidence that Herek may have fabricated the statement is enough to show that he should have entertained serious doubts.  To require a defendant to actually have doubts about the accuracy where, as here, there is evidence that the defamatory statement was fabricated, would eviscerate the "reckless" standard.  *See Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982) ("[W]hether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."), *aff'd*, 466 U.S. 485 (1984).

Indeed, the Supreme Court rejected this argument in *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).  After noting that the reckless disregard standard may "put[] a premium on ignorance," the Court clarified that:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.  The finder of fact must determine whether the publication was indeed made in good faith.  Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination . . . .

*Id*.

To the extent that Herek may have "misquoted" earlier broadcasts, the United States Supreme Court has held that "alteration of the words uttered by a plaintiff may be equate[d] with knowledge of falsity" if "the alteration results in a *material change* in the meaning conveyed by the statement."  *Masson*, 501 U.S. at 517 (emphasis added).  Here, stating that Plaintiffs were

- 22 -

accused of stealing drugs rather than "items" caused a material change in the meaning.  In contrast to other types of personal "items", most street drugs are illegal.  "Stealing drugs" may imply that the officers themselves were drug users or sold drugs.  Thus, by stating that Plaintiffs were accused of stealing drugs, Channel 5 materially changed the meaning of the statement by adding another layer of criminality to the Plaintiffs' alleged conduct.[9]

In summary, Plaintiffs have presented sufficient evidence for a reasonable jury to find that Herek purposefully avoided or deliberately ignored facts establishing the falsity of the statement.  Accordingly, Defendant's motion for summary judgment will be denied with respect to this defamatory statement.

## IV

Accordingly it is **ORDERED** that Defendant's Motion to Summary Judgment (ECF No. 16) is **GRANTED IN PART AND DENIED IN PART**.  To the extent that Defendant seeks summary judgment on the statements that Plaintiffs "were accused of stealing during a raid", its motion for summary judgment is **GRANTED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 23, 2014

<div style="border:1px solid black; padding:10px;">

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 23, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>

---

[9] Plaintiffs also imply that Defendants' defamatory statements were the results of "ill will" toward the Plaintiffs, though they do not specifically state how this ill will is manifested.  Resp. at 18-19.   It appears that Plaintiffs imply that the mere fact that Defendants may have made defamatory—or at the least, negative—remarks about Plaintiffs is evidence of ill will.   However, "actual malice cannot be inferred from evidence of personal spite or ill will." *McKimm*, 729 N.E.2d at 373.